LITTLER MENDELSON, P.C.
STEVEN A. GROODE, Bar No. 210500
sgroode@littler.com
2049 Century Park East, 5th Floor
Los Angeles, CA  90067.3107
Telephone:     310.553.0308
Facsimile:      310.553.5583

LITTLER MENDELSON, P.C.
JOHN H. ADAMS, JR., Bar No. 253341
jhadams@littler.com
500 Capitol Mall, Suite 2000
Sacramento, CA  95814
Telephone:     916.830.7200

Attorneys for Defendant
MEDLINE INDUSTRIES, INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO JIMENEZ,<br><br>          Plaintiff,<br><br>v.<br><br>MEDLINE INDUSTRIES, INC.,<br>MARCUS RODRIGUEZ, and DOES 1-25,<br>inclusive,<br><br>          Defendant. | Case No.  2:17-cv-00536-KJM-DB<br><br>**APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANT MEDLINE INDUSTRIES, INC.'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>Date:       July 13, 2018<br>Time:       10:00 a.m.<br>Ctrm.:      3, 15th Floor<br>Judge:      Hon. Kimberly J. Mueller |

LITTLER MENDELSON, P.C.
2049 Century Park East
5th Floor
Los Angeles, CA  90067.3107
310.553.0308

Firmwide:155213370.1 049790.1040

Case No.  2:17-cv-00536-KJM-DB

APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

Defendant MEDLINE INDUSTRIES, INC., hereby submits its Appendix of Exhibits in support of its Motion for Summary Judgment or, Alternatively, Partial Summary Judgment.

| EXHIBIT | DOCUMENT |
|---------|----------|
| A. | Plaintiff's First Amended Complaint |
| B. | Excerpts from Deposition of Plaintiff Antonio Jimenez, taken February 21, 2018 |
| C. | Declaration of Scott Saling In Support of Defendant Medline Industries, Inc.'s Motion for Summary Judgment or, Alternatively, Partial Summary Judgment |

Dated: June 15, 2018                    LITTLER MENDELSON, P.C.


By: */s/ John H. Adams, Jr.*
STEVEN A. GROODE
JOHN H. ADAMS, JR.
Attorneys for Defendant
MEDLINE INDUSTRIES, INC.

LITTLER MENDELSON, P.C.
2049 Century Park East
5th Floor
Los Angeles, CA  90067.3107
310.553.0308

Firmwide:155213370.1 049790.1040                    2.                    Case No.  2:17-cv-00536-KJM-DB

APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

# EXHIBIT A

Marjorie Heinrich (SBN 124682)
Ethan A. Wimert (SBN 266059)
**HEINRICH LAW, PC**
180 Grand Ave., Ste. 1390
Oakland, CA 94612
Telephone:    (510) 944-0110
Facsimile:    (510) 944-0109

Attorneys for Plaintiff
ANTONIO JIMENEZ

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN JOAQUIN

UNLIMITED JURISDICTION

| | |
|---|---|
| ANTONIO JIMENEZ,<br><br>      Plaintiff,<br><br>v.<br><br>MEDLINE INDUSTRIES, INC.; MARCUS RODRIGUEZ; and DOES 1-25, inclusive,<br><br>      Defendants. | Case No. STK-CV-UPI-2016-2986<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>   1) **NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION**<br><br>   2) **NEGLIGENCE**<br><br>**DEMAND FOR JURY TRIAL** |

1

FIRST AMENDED COMPLAINT FOR DAMAGES

Exhibit A-1

Plaintiff in the above captioned matter hereby complains of Defendants named above, and each of them, as follows:

## I.   INTRODUCTION

1.      On or about October 26, 2015, Plaintiff ANTONIO JIMENEZ (hereinafter "JIMENEZ") had been assigned by his employer Atwork Personnel Services to work at the MEDLINE INDUSTRIES, INC. (hereinafter "MEDLINE") warehouse located at 18250 Murphy Parkway in Lathrop, California. At approximately 9:45 a.m., JIMENEZ was seriously injured when MEDLINE employee MARCUS RODRIGUEZ (hereinafter "RODRIGUEZ"), who was operating a forklift at the time, impaled JIMENEZ with the blades of the forklift he was driving. Defendant RODRIGUEZ's reckless and/or negligent act occurred in the course and scope of his employment with Defendant MEDLINE and/or DOES 1-25.

2.      As a legal result of the Defendants, and their wrongful conduct hereafter set forth, Plaintiff JIMENEZ suffered serious injuries and damages as set forth below.

## II.   JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this matter pursuant to Code of Civil Procedure Section 395 because, at all relevant times, the events which combined to produce the injuries sustained by Plaintiff JIMENEZ occurred in San Joaquin County.

4.      Venue is proper in the San Joaquin County because a substantial part of the events, acts, omissions, and transactions complained of herein occurred in and/or originated from San Joaquin County. The amount in controversy exceeds the jurisdictional minimum of this court.

## III.   PARTIES

5.      Plaintiff ANTONIO JIMENEZ is a natural person who is, and at all times mentioned in this complaint was a resident San Joaquin County. At the time of the incident

2

**FIRST AMENDED COMPLAINT FOR DAMAGES**

Exhibit A-2

complained of herein, Plaintiff was an employee of a personnel service provider agency called Atwork Personnel Services ("Atwork"). As an employee of Atwork, Plaintiff had been assigned to work at a warehouse owned and operated by Defendant MEDLINE. At the time of the incident complained of herein, Plaintiff had only been assigned to the MEDLINE facility for approximately two weeks.

6.      Defendant MEDLINE is, on information and belief, a corporation that owns, manages, maintains, and operates a medical supply warehouse located at 18250 Murphy Parkway in Lathrop, California.

7.      At the time of the incident complained of herein, Defendant MEDLINE contracted with Atwork as a "Service Provider." A copy of the contract is attached hereto as **Exhibit A.** As a "Service Provider," Atwork, at its discretion, agreed to assign certain of its employees to perform work at the MEDLINE facility. Among other things, the contract expressly states that: **"[t]he parties recognize that Medline is neither the employer nor the joint employer of Service Provider's employees."** (Exhibit A.) The contract further states that: "Service Provider shall supervise its employees in accordance with accepted industry practices and ensure that they follow the reasonable rules and regulations of Medline when Service Provider employees are on Medline's premises." (Exhibit A.) In addition to retaining its status as the sole employer and supervisor of workers assigned to work on MEDLINE's premises, Atwork retained responsibility for all payroll and human resources related services with respect to its employees.

8.      Plaintiff is informed and believes, and thereon alleges, that Defendant MARCUS RODRIGUEZ was at all times mentioned herein, an employee, agent, representative, and/or joint venturer of Defendant MEDLINE, in providing services as a forklift operator at the establishment owned, operated, managed, advertised, controlled, supervised, and/or promoted by Defendant MEDLINE.

9.      The true names and capacities, whether individual, corporate, associate, or otherwise of Defendants DOES 1 through 25, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names pursuant to Code of Civil Procedure Section 474.

3

FIRST AMENDED COMPLAINT FOR DAMAGES

Exhibit A-3

1 | Wherever in this Complaint there is reference to "Defendants," such reference shall include each
2 | expressly named Defendant and Defendants DOES 1 through 25, and each of them.

3 |     10.    Plaintiff JIMENEZ further alleges that each of said fictitious Defendants is in
4 | some manner responsible for the acts and occurrences hereinafter set forth. Plaintiff will amend
5 | this Complaint to show their true names and capacities when the same are ascertained, as well as
6 | the manner in which each fictitious Defendant is responsible.

7 |     11.    At all times herein mentioned, Defendants, and each of them, were the agents,
8 | servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each
9 | of the other Defendants named herein and were at all times operating and acting within the
10 | purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy,
11 | and/or joint venture, and each Defendant has ratified and approved the acts of each of the
12 | remaining Defendants. Each of the Defendants aided and abetted, encouraged, and rendered
13 | substantial assistance to the other Defendants in breaching their obligations to Plaintiff, as
14 | alleged herein. In taking action to aid and abet and substantially assist the commission of these
15 | wrongful acts and other wrongdoings complained of, as alleged herein, each of the Defendants
16 | acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct
17 | would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and
18 | wrongdoing.

19 |

## IV.   FACTUAL BASIS FOR ASSERTED CLAIMS

21 |     12.    At approximately 9:45 on the morning of October 26, 2015, Plaintiff JIMENEZ
22 | had been assigned by his employer to work at the MEDLINE facility in Lathrop, California.
23 | After maneuvering his stand-up forklift towards the end of aisle 34, he stopped and offloaded the
24 | items he was transporting. He had begun to scan a new item when he felt a jab in his buttocks
25 | and instinctively jumped forward. Before he knew exactly what had happened, JIMENEZ turned
26 | around to see that MEDLINE employee RODRIGUEZ had driven his forklift dangerously close
27 | to him. Upon seeing a concerned look on RODRIGUEZ's face, JIMENEZ placed his hand on his
28 | buttocks, and discovered that he was bleeding profusely. RODRIGUEZ then acknowledged that

FIRST AMENDED COMPLAINT FOR DAMAGES

Exhibit A-4

1 he had driven the blades of his forklift into JIMENEZ's buttocks as RODRIGUEZ was lowering

2 the forks.

3      13.     Plaintiff is informed and believes, and thereon alleges, that Defendant

4 RODRIGUEZ had, in close proximity to the incident complained of herein, been involved in at

5 least one serious forklift-related accident in his capacity as an employee of MEDLINE.

6      14.     JIMENEZ, lightheaded from blood loss, was able to maneuver his forklift out of

7 aisle 34 and towards the front of the warehouse, leaving a trail of blood behind him. When

8 JIMENEZ reached MEDLINE's shift supervisor, the supervisor went into a panic at the sight of

9 JIMENEZ's injury. Before calling emergency medical personnel, or rendering any medical

10 treatment to JIMENEZ himself, the supervisor called someone who, on information and belief

11 was his supervisor, imploring that person to come to the warehouse from another location.

12 During this time, JIMENEZ continued to bleed out onto the floor.

13      15.     After approximately twenty minutes, RODRIGUEZ, and not any MEDLINE

14 supervisors, called an ambulance on JIMENEZ's behalf.

15      16.     JIMENEZ was thereafter transported to the hospital, where he was treated on an

16 emergency basis for his life-threatening wounds.

17      17.     On information and belief, a state investigation of the incident complained of

18 herein concluded that MEDLINE had no plan or procedure in place to investigate occupational

19 injuries to those on its premises.

20

21                    **FIRST CAUSE OF ACTION**
             **NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION**
22                **(Against Defendants MEDLINE and DOES 1-25, inclusive)**

23      18.     Plaintiff incorporates and re-alleges each of the allegations set forth above as

24 though fully set forth herein.

25      19.     At all times mentioned herein, JIMENEZ had the expectation that he would be

26 safe and secure while working at the MEDLINE facility.

27

28

                                    5

20.    At all times mentioned herein, Defendant MEDLINE had a responsibility to properly identify, screen, select, train, supervise, monitor, oversee, and/or evaluate its employees and/or independent contractors to ensure the fitness of such individuals for employment.

21.    At all times mentioned herein, Defendant RODRIGUEZ, and/or DOES 1-25 was unfit to perform the work of a forklift operator at MEDLINE, for which, on information and belief, Defendant MEDLINE hired him.

22.    At all times mentioned herein Defendant MEDLINE knew or should have known that Defendant RODRIGUEZ, and/or DOES 1-25 was unfit to work as a forklift operator and that this lack of fitness created a particular risk of harm to others, such as Plaintiff JIMENEZ.

23.    As a result of this lack of fitness for performing work as a forklift operator, Defendant RODRIGUEZ, and/or DOES 1-25, caused harm to Plaintiff JIMENEZ.

24.    As a direct and legal result of Defendant MEDLINE's failure to properly identify, screen, select, train, supervise, monitor, oversee, and/or evaluate the fitness of Defendant RODRIGUEZ, and/or DOES 1-25, as a forklift operator, JIMENEZ suffered, and continues to suffer, the injuries and damages hereinafter set forth.

25.    As a direct and legal cause of Defendant MEDLINE's wrongful conduct, JIMENEZ suffered, and continues to suffer, the injuries and damages hereinafter set forth.

26.    As a direct and legal cause of the wrongful conduct of Defendants MEDLINE, RODRIGUEZ, and/or DOES 1-25, alleged above, Plaintiff JIMENEZ was injured in his health, strength, and activity, and sustained physical and emotional injury, all of which has caused JIMENEZ great physical, mental, and nervous pain and suffering, all to his general damages in an amount according to proof.

27.    By reason of the wrongful conduct of Defendants MEDLINE, RODRIGUEZ and/or DOES 1-25, JIMENEZ was required to and continues to employ physicians and other health care providers to examine, treat, and care for his injuries, and has incurred, and will continue to incur, medical and incidental expenses for such examination, treatment, rehabilitation, and care in an amount according to proof.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

Exhibit A-6

28.     By further reason of MEDLINE, RODRIGUEZ, and/or DOES 1-25's wrongful conduct, JIMENEZ has suffered a loss of income and a loss of earning capacity in an amount according to proof.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SECOND CAUSE OF ACTION
### NEGLIGENCE
### (Against All Defendants)

29.     Plaintiff incorporates and re-alleges each of the allegations set forth above as though fully set forth herein.

30.     At all times mentioned herein, MEDLINE operated a warehouse located at 18250 Murphy Parkway in Lathrop, California, at which medical supplies were received and shipped.

31.     At all times mentioned herein, MEDLINE employed RODRIGUEZ, at least in part to operate forklifts at its warehouse in Lathrop.

32.     At all times mentioned herein, Defendant RODRIGUEZ had a duty to operate his forklift in a reasonably safe manner in order to avoid injury to others.

33.     Defendant RODRIGUEZ breached his duty to operate his forklift in a reasonably safe manner when he drove said forklift into Plaintiff JIMENEZ, who, through no fault of his own, was impaled on the fork blades.

34.     As a direct and legal cause of the wrongful conduct of Defendants, JIMENEZ suffered, and continues to suffer, the injuries and damages set forth above.

WHEREFORE, Plaintiff prays for relief as set forth below.

///
///
///

7

Exhibit A-7

## V.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as hereinafter set forth:

1.   For compensatory and general damages according to proof;

2.   For past future medical, incident, and services expenses according to proof;

3.   For past and future loss of earning and earning capacity according to proof;

4.   For pre-judgment and post-judgment interest on all damages as allowed by law;

5.   For costs of suit incurred herein;

6.   For such other and further relief as the Court may deem just and proper.

DATED: June 22, 2016                                HEINRICH LAW, PC

                                     By: _____

                                         MARJORIE HEINRICH
                                         ETHAN WIMERT
                                         Attorneys for Plaintiff
                                         ANTONIO JIMENEZ

8

Exhibit A-8

# EXHIBIT A

## SERVICE AGREEMENT

The following terms and conditions are agreed to and shall govern this Service Agreement ("Agreement") entered into by and between Medline Industries, Inc., an Illinois corporation ("Medline") and ("Service Provider"). The below signatures constitute full acceptance of the following terms and conditions by Medline and by Service Provider, respectively. This Agreement will be effective as of the date of signature and shall remain in full force and effect until terminated in writing by either Medline or Service Provider.

1.      Service Provider agrees to and shall provide Medline, prior to entering into this Agreement, and on March 1 and September 1 of each year, sufficient evidence verifying that Service Provider has registered with and has maintained its registration in good standing with DOL. Further, Service Provider agrees to and shall provide Medline with all postings required by DOL and with the required DOL forms, including but not limited to the work verification form.

2.      Service Provider warrants that before assigning any Service Provider employee to work at Medline, it will confirm that the employee has passed a drug test and a corresponding national background check. Service Provider shall be responsible for obtaining and administering I-9 documentation of its employees' right to work in the United States and agrees to maintain the Form I-9s for each Service Provider employee assigned to Medline, including those employees assigned to work at Medline prior to the effective date of this Agreement.   Service Provider warrants that any employee assigned to Medline is legally permitted to work in the United States.   Service Provider further warrants that all pre-employment selection procedures, including but not limited to, background and drug checks, are compliant with Federal, state and Local labor and employment laws, regulations and ordinances.  Further, Service Provider agrees that it will not discriminate against employees or

I

Exhibit A-10

applicants on any basis which is unlawful under Federal, State or Local labor and employment laws, regulations and ordinances.

3.  It is agreed that Medline will provide safe places of employment and establish sound operating practices which will result in safe working conditions for Service Provider employees that comply with all laws and ordinances related to occupational safety and health.

4.  Service Provider will maintain Workers Compensation Insurance for its employees assigned to Medline, and provide proof of such insurance to Medline on request. Any Workers Compensation claim made by a Service Provider employee assigned to Medline is solely the responsibility of Service Provider.

5.  The parties recognize that Medline is neither the employer nor the joint employer of Service Provider's employees. Service Provider shall indemnify, defend and hold harmless Medline from and against any and all claims by such employees for the privileges and benefits of employment, including but not limited to claims for wages, compensation and other benefits.

6.  Service Provider shall supervise its employees in accordance with accepted industry practices and ensure that they follow the reasonable rules and regulations of Medline when Service Provider employees are on Medline's premises. Medline agrees to implement safety principles and provide knowledge essential for the development and understanding of proper safety attitudes and to provide an orientation of those procedures to each new Service Provider employee assigned to Medline. Medline agrees to provide Service Provider employees assigned to Medline with necessary safety equipment and personal protective equipment.

7.  All hours worked in excess of forty (40) hours per week will be deemed overtime and billed at time and one half. A week is identified and defined as Sunday through Saturday.

Exhibit A-11

8.     The minimum assignment length is four (4) hours.  Service Provider agrees that shall comply with and represents that it complies with all applicable state labor laws and regulations relating to wage payment and temporary labor services.  Service Provider agrees to indemnify, defend and hold harmless Medline against any and all claims of violations of.the foregoing laws, and for any claims under Federal, State and Local labor and employment laws, regulations and ordinances.

9.     Services to be furnished hereunder shall be provided in compliance with Executive Order 11246, Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974, and Section 503 of the Rehabilitation Act of 1973, and upon request from Medline, Service Provider will furnish evidence of compliance and permit access to his books, records and accounts during normal business hours for purposes of investigation to ascertain compliance with such rules, regulations and orders.  Service Provider represents and warrants to Medline that, as of the date of this Agreement, Service Provider is in full compliance with all Equal Employment Opportunity laws, regulations and orders, including those set forth above. The provisions of Executive Order 11246, as amended, Section 402 and Section 503, and the rules and regulations issued pursuant thereto are hereby incorporated into this Agreement by reference, and Service Provider shall comply therewith unless exempted. Service Provider will include the provisions of this paragraphs in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of said Executive Order, so that such provisions will be binding upon each subcontractor or vendor.

10.    If a Service Provider employee is assigned to Medline and shows up at the appointed time and is/remains ready, willing and able to work, but is not utilized or is not

3

utilized for the full four (4) hours, the Service Provider employee shall be paid for four (4) hours. However, in the event that Service Provider contracts the employee to work at another location during the same shift, the employee shall be paid a minimum of two (2) hours pursuant to statute and DOL regulations. This amount will then be billed to Medline.

11.   Pricing and other commercial terms of Service Providers services are set forth is a separate document, which is to be treated as part of and incorporated into this Agreement.

12.   This Agreement contains the entire agreement and understanding between the parties concerning the matters described and supersedes all prior agreements, discussions, negotiations, understandings and proposals of the parties, except as otherwise referenced herein. The terms of this Agreement cannot be changed except in a subsequent document signed by Medline and Service Provider.

By execution of this Service Agreement, Medline and Service Provider each certify and agree to the terms and conditions set forth herein.

Service Provider
By: _Patricia Cnoe_
Its: _Area Manager_
Date: _6|11|2015_

Medline Industries, Inc.
By: _____
Its: _____
Date: _____

Exhibit A-13



*This Document is the Property of Medline Industries Inc., Mundelein, IL. 60060*

## Contractor Compliance Certification

Medline Industries, Inc. requires any contractor whose employees require access to our warehouse facility adhere to the following requirements:

1. Contractor agrees to perform a criminal background check and drug screen of employees prior to assigning to a Medline facility;

2. Contractor agrees to review and enforce the following rules with their employees assigned to Medline:

   a. Employees will access the Medline facility through the main office entrance only.

   b. Employee must sign in when entering and sign out when leaving Medline, recording time in and out.

   c. Employee will be given a visitor badge which must be worn at all times while in the facility;

   d. Employees are only allowed in areas of the warehouse necessary to carry-out their assigned tasks;

   e. All refuse or trash collected by the employee during the course of performing their assigned tasks must be discarded in Medline's trash receptacle; trash cannot be removed from the premises by the contractor's employee. The only exception is for trash which requires special disposal because of its quantity, concentration, or physical, chemical, or biological characteristics. For instance pesticide containers, absorbent material used in spill cleanup, or mechanical waste such as used motor vehicle oil. Any questions regarding trash disposal must be brought to the attention of the facility Director of Operations or designee.

3. Contractor is aware that any breach of the above could result in a review of the contractor's agreement with Medline.

**Signature Verification**

1. The undersigned agrees with these requirements.
2. This agreement is considered confidential and proprietary between Medline Industries and the Contractor.

Contractor ___Atwork Personnel___

Printed Name: ___Patricia Page___

Signed: ___Patricia Page___

Title: ___Area Manager___

Date: ___6/11/2015___

## PROOF OF SERVICE

### *Jimenez v. Medline Industries, et al., et al.*
**Superior Court of California, County of San Joaquin, Case No.: STK-CV-UPI-2016-2986**

I, Andrea Searby, declare that:

I am employed in the County of Alameda, State of California. I am over the age of 18, and am not a party to this action. My business address is 180 Grand Ave., Ste. 1390, Oakland, California 94612.

On June 22, 2016, I served:

### FIRST AMENDED COMPLAINT FOR DAMAGES

in said cause addressed as follows:

| | |
|---|---|
| John Adams | ***Attorneys for Medline Industries, Inc.*** |
| Littler Mendelson | |
| 500 Capitol Mall, Suite 2000 | |
| Sacramento, CA 95814 | |
| tel:       (916) 830-7244 | |
| fax:      (916) 560-5136 | |
| JHAdams@littler.com | |

/XX/    (VIA U.S. MAIL (C.C.P. §§ 1013(a), 1013a(3)) by placing a true and correct copy of the foregoing document(s), enclosed in a sealed envelope with postage thereon fully prepaid, for collection and mailing following ordinary business practices, addressed as set forth above.

I am readily familiar with the firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. Under that practice correspondence would be deposited with the United States Postal Service, at Oakland, California, that same day in the ordinary course of business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on June 22, 2016 in Oakland, California.

Andrea Searby

Exhibit A-15

# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--o0o--

ANTONIO JIMENEZ,

        Plaintiff,

vs.                          Case No. 2:17-cv-00536-KJM-DB

MEDLINE INDUSTRIES, INC.,
MARCUS RODRIGUEZ, and DOES
1-25 inclusive,

        Defendants.
_____/


VIDEOTAPED DEPOSITION OF

ANTONIO JIMENEZ

WEDNESDAY, FEBRUARY 21, 2018



Reported by:
MELISSA LYNN HILL, CSR No. 9613
Job No:  734RP8

Antonio Jimenez                                           02/21/2018

```
      1 | A.       -- that filed the claim.
      2 | Q.       Okay.  But in any event, whoever filed it it
      3 | didn't go anywhere?
      4 | A.       It didn't go nowhere.
10:14 5 | Q.       Okay.  And that was because you recovered --
      6 | A.       Yes.
      7 | Q.       -- in a couple of weeks?
      8 | A.       Yes.
      9 | Q.       And then returned to work?
10:14 10 | A.      Yes.
     11 | Q.       Okay.  Have you ever filed any other workers'
     12 | compensation claim other than that one that was filed on
     13 | your behalf?
     14 | A.       No, not that I recall.
10:15 15 | Q.      Do you have a workers' compensation claim going on
     16 | related -- related to this case?
     17 | A.       No.
     18 | Q.       So you never filed a workers' compensation claim
     19 | related to the injury you suffered in this case?
10:15 20 | A.      For this case?  I believe I did but it -- it's --
     21 | what would be the right terminology?
     22 |          MS. HEINRICH:  Resolved.
     23 |          THE WITNESS:  Resolved.
     24 | Q.       BY MR. ADAMS:  I'm sorry, it has resolved or --
10:15 25 | A.      Yes.
```

14

Antonio Jimenez                                            02/21/2018

1  Q.      How did it resolve?

2          THE WITNESS:  How would I word that?

3          MS. HEINRICH:  You can just tell him it settled.

4          THE WITNESS:  Yeah, it settled.  The workmen's

10:1□ 5  comp claim was settled.

6  Q.      BY MR. ADAMS:  Okay.  Do you have any other

7  information about how it settled?

8  A.      No, they just -- I mean they paid all my bills and

9  then once I got cleared by the doctor to go to work, they

10:15 10  offered me a settlement.

11  Q.      Okay.  And you accepted that settlement; is that

12  correct?

13  A.      Yes.

14  Q.      Okay.  How much was that settlement for?

10:1□ 15  A.      It was --

16          MS. HEINRICH:  Objection.  Privacy.  Collateral

17  source.  You can answer the question.

18          THE WITNESS:  Around 8,000.

19  Q.      BY MR. ADAMS:  And when did that happen?  When was

10:16 20  it finally resolved?

21  A.      I don't know an exact date, but it was 2016 or --

22  yeah, I want to say the end of 2016.

23  Q.      Are you -- are you sure about that date range?

24  Could it possibly have been the beginning of 2017 or

10:16 25  you're pretty sure it was --

15

Antonio Jimenez                                    02/21/2018

```
 1  Q.      So, in other words, the union was just too busy or
 2  distracted to take care of you?
 3  A.      Yeah.
 4  Q.      Did you have a job after Unified Grocers?
 5  A.      Yes.
 6  Q.      What was that?
 7  A.      AtWork Personnel.
 8  Q.      And when did you start there?
 9  A.      I believe I started there in September of 2015 or
10  two thousand ...  yeah, 2015, September.
11  Q.      So how long were you out of work between Unified
12  Grocers and AtWork?
13  A.      About nine -- nine months.  I mean I did
14  under-the-table work for my uncle.  He owns a concrete
15  company.
16  Q.      What kind of work were you doing for your uncle?
17  A.      Concrete.
18  Q.      Pouring, setting forms, stuff like that?
19  A.      All of it.  Just manual labor.
20  Q.      Okay.  How long did you work for your uncle's
21  concrete company?
22  A.      Off and on about a year, two years maybe just off
23  and on.
24  Q.      How many days per month do you think you averaged?
25  A.      10, 15.
```

10:30 (lines 5-10)
10:30 (line 15)
10:31 (line 20)
10:31 (line 25)

26

Antonio Jimenez                                          02/21/2018

1  Q.      Was that just whenever your uncle needed you?

2  A.      Yeah.  Yes, or when I asked him.

3  Q.      Did you choose not to work more or was that just

4  what was available?

10:31  5  A.      That was what was available.

6  Q.      I see.  But you weren't paid on the books for that

7  job?

8  A.      No.

9  Q.      What was your hourly rate at that company?

10:31 10  A.      $21.

11  Q.      What was your hourly rate at Unified Grocery

12  (sic)?

13  A.      $24.53.

14  Q.      When did you first start working at Medline?

10:3? 15  A.      I was put on the assignment I believe at the

16  beginning of October, the first week of October 2015.

17  Q.      Was that your first assignment?

18  A.      Yes.

19  Q.      And where did you do that work when you were

10:3? 20  working for Medline?

21  A.      Lathrop.

22  Q.      Lathrop?

23  A.      Yes.

24  Q.      Okay.  And that was a warehouse?

10:3? 25  A.      Yes.

27

Antonio Jimenez                                                    02/21/2018

1  Q.      Okay.   And what were your job duties when you were

2  working for Medline?

3  A.      For the first two days I was just learning the

4  environment and order selecting.

10:33  5  Q.      What -- what do you mean by "learning the

6  environment"?   Can you describe that for me?

7  A.      Just learning how the aisles work and like where

8  everything's at and just like the process of how to load

9  things to doors and make sure it gets to where it needs to

10:33  10  go.

11  Q.      And forgive me because I'm going to have to just

12  lean on you for a lot of this.   What does loading the

13  doors mean?

14  A.      Well, so you get a -- you pick -- like you pick

10:34  15  products.   So Medline did a lot of medical equipment and

16  they shipped it to hospitals.

17  Q.      Okay.

18  A.      So you would pick products, put it in boxes, and

19  then put it on a pallet and take it to the door for a

10:34  20  loader to put it in the truck to ship out to the

21  hospitals.

22  Q.      I see.   So each door was for a particular truck?

23  A.      Yes.

24  Q.      Understood.   And then a loader is someone who took

10:34  25  the product that you placed by the door and put it

28

Exhibit B-6

rpcourtreporters.com

Antonio Jimenez                                          02/21/2018

1  physically on the truck?

2  A.      Yes.

3  Q.      Okay.  Got you.  Thank you.  And so you were

4  basically familiarizing yourself with the workplace and

10:34  5  how everything works?

6  A.      Yeah, for only maybe two or three days I was doing

7  that.

8  Q.      Okay.  Was that a pretty big warehouse?

9  A.      Yes.  They had two buildings.

10:34 10  Q.      Two buildings.  How many aisles were each

11  building, do you remember?

12  A.      I don't -- I don't remember.

13  Q.      Okay.  So if you kind of visualize a football

14  field, were the buildings each 50 yards wide or ...

10:35 15  A.      More than that.  No, I would say one and a half

16  football fields long and three football fields wide.  It

17  was pretty big.

18  Q.      And was each building the same size?

19  A.      No.  There was another one that was smaller.

10:35 20  Q.      Got you.  Did you work in both buildings or just

21  one?

22  A.      I worked in the big building for the first three

23  days and then after that I was -- they noticed that I -- I

24  had experience on a forklift, and they moved me to the

10:35 25  other building with a lot smaller staff.

29

Exhibit B-7

Antonio Jimenez                                          02/21/2018

```
 1  Q.      Do you know how many people were in the staff in
 2  the smaller building?
 3  A.      Seven.
 4  Q.      Seven?
 5  A.      Seven.
 6  Q.      Is that an estimate or do you have a clear
 7  recollection?
 8  A.      It's an estimate.
 9  Q.      Okay.
10  A.      Yeah.
11  Q.      And so what was your -- what was your job title
12  there when you were working for Medline?
13  A.      In what building?
14  Q.      In the smaller building.
15  A.      The smaller building?  I was a forklift operator.
16  Q.      Okay.  And is it correct that after that first two
17  or three days you only worked in the smaller building?
18  A.      Yes.
19  Q.      Okay.  You never went back even like for a day or
20  something at the bigger building?
21  A.      No.
22  Q.      Was the work in the smaller building and the
23  bigger building the same type of work?
24  A.      No.
25  Q.      What was the difference?
```

10:36 5
10:36 10
10:3 15
10:36 20
10:36 25

30

Exhibit B-8

Antonio Jimenez                                                02/21/2018

```
        1  working for Medline?

        2  A.      AtWork Personnel.

        3  Q.      How would they assign that?

        4  A.      Call me and tell me what it was that I needed to

10:48   5  do.

        6  Q.      Okay.  And if someone needed you to fold boxes one

        7  day, who would tell you that?

        8  A.      Just -- I think a lead is what they would call it

        9  there.

10:48  10  Q.      Any lead in particular or just any -- any -- any

       11  one lead?

       12  A.      Yeah, just -- no, there -- I think there was a

       13  couple in the smaller building that I was at.  They just

       14  said, hey, we need you to do this and I had -- I didn't

10:48  15  ask no questions.  I just did what they asked me to do.

       16  Q.      Do you recall any of the names -- the names of the

       17  leads?

       18  A.      No.

       19  Q.      So if something changed during your workday it was

10:48  20  a lead who would tell you that?

       21  A.      Yes.

       22  Q.      And they would tell you in person?

       23  A.      Yes.

       24  Q.      What kinds of things would the leads tell you

10:49  25  about your specific duties on a given day?
```

                                                                        40

Antonio Jimenez                                    02/21/2018

```
 1  A.      Just anything they needed help with.  Like, hey,
 2  can you help receive this door or can you help receive
 3  that door or fill this aisle if you can or move something
 4  from here to there.
```
10:49   5  Q.      How often would that happen?
```
 6  A.      Not too often.  Maybe once or three times maybe
 7  out of the period I was there.
 8  Q.      Well, how would you know specifically what you
 9  were supposed to do when you showed up at work in the
```
10:49  10  morning?
```
11  A.      They would give you the job in the morning.  But I
12  was always considered receiving, a receiver.  That's why I
13  went to that building because I had significant experience
14  and certifications for a reach lift and I had the skill.
```
10:50  15  Q.      When you said they would give you the job, who's
```
16  "they"?
17  A.      So there was a shift meeting in the middle -- I
18  mean in the morning every day before the shift just saying
19  what to expect and what amount of pallets and product is
```
10:50  20  going to go out.  And then they would just go down the
```
21  list.  You're gonna do this.  You're going to do that.
22  You're gonna do this.  Can you do this pretty much.
23  Q.      "Can you do this," like are you -- are you -- can
24  you handle this particular job or --
```
10:50  25  A.      Yeah.

41

Antonio Jimenez                                          02/21/2018

1  quantity of it picked today.

2  Q.      So would they tell you the specific pick slots

3  that you needed to work?

4  A.      No.  So when you go to a door, I -- I -- I believe

10:53 5  there was a shift that started before us and all they did

6  was unload the trucks and put it on the dock.  And the

7  pallets were wrapped already and they would get stickers,

8  which is our put-away stickers.  And there's a scanner on

9  it.  Well, there's a bar code on it, and you scan it with

10:53 10 your equipment and it tells you where to put it for the

11 inventory purposes, you know, so they know where

12 everything's at when they need it and everything.  And it

13 would just tell you where to put it.

14 Q.      I see.  So you'd be assigned a particular door or

10:54 15 doors, correct?

16 A.      Yes.

17 Q.      And then you would go to that door or doors and --

18 A.      Just start with one pallet and work your way

19 through.

10:54 20 Q.      Okay.  And then just scan it and see where it

21 needed to go and then take it there.

22 A.      Scan it, see where it needed to go, take it there,

23 and then scan the rack that you put it in and then it's

24 complete and then you go to the next one.

10:5_ 25 Q.      Got you.  And then occasionally while you were

44

Antonio Jimenez                                    02/21/2018

1   doing that, a lead might come up to you and say, hey, we

2   need something else done; is that right?

3   A.        Hey, can you go get pallets or, hey, can you go do

4   this or -- yeah.

10:5  5   Q.        When would that happen?  When -- when something

6   came up or they just needed particular help?

7   A.        Just when something came up.  Yeah, it wasn't --

8   there wasn't any specific time.  Just anything they needed

9   if they saw me.  I mean they probably would have done it

10:5  10   to anybody, but if they saw me they would just be like,

11   hey, yeah, forklift, can you go do that, which requires a

12   forklift.

13   Q.        Got you.

14   A.        So ...

10:55  15   Q.        I see.  And you said the supervisor would usually

16   leave after 20 or 30 minutes, go to the bigger building,

17   correct?

18   A.        Yeah, I didn't -- I didn't see him the rest of the

19   day.

10:55  20   Q.        Okay.  You never saw them again or just usually --

21   A.        I mean I -- maybe towards the end of the shift

22   but, yeah, I rarely ever saw him besides in the beginning.

23   Q.        Okay.

24   A.        When the intern came from I believe I want to say

10:55  25   Michigan, he was there for the majority of the day.  Well,

45

Antonio Jimenez                                                    02/21/2018

```
 1  A.       Yeah.
 2           MR. ADAMS:  It's been about an hour.  Let's take a
 3  quick break.
 4           THE VIDEOGRAPHER:  We're off the record at 10:57.
11:13  5     (Recess taken.)
 6           THE VIDEOGRAPHER:  We're back on the record at
 7  11:13.
 8  Q.       BY MR. ADAMS:  So when you -- your first two or
 9  three days you were in the big -- the big building,
11:13 10  correct?
11  A.       Yes.
12  Q.       And then you switched to the smaller building and
13  that's where you were the rest of the time, correct?
14  A.       Yes.
11:13 15  Q.  Who told you you were going to be making that
16  switch?
17  A.       My employer.
18  Q.       Specifically who?
19  A.       AtWork Personnel.
11:13 20  Q.  Specifically who at AtWork Personnel?
21  A.       She was the receptionist.  I don't remember her
22  name.
23  Q.       And when did she tell you that?
24  A.       The day before I switched to the other shift.
11:13 25  Q.  Got you.  And did she say why that switch was
```

47

Antonio Jimenez                                           02/21/2018

1  happening?

2  A.        She says I was experienced on the forklift and

3  they needed help over there with somebody experienced on

4  the forklift.

11:13  5  Q.        So, in other words, Medline told her that because

6  of his experience, we want him to work in this other

7  building?

8  A.        Yes.

9  Q.        And it was specifically because of the forklift

11:14  10  experience.

11  A.        Yes.

12  Q.        So when you were working for Medline, who was your

13  supervisor?

14  A.        I don't recall his name.  Like the main

11:14  15  supervisor?

16  Q.        Correct.

17  A.        I don't remember his name.

18  Q.        So the person you've described as the supervisor

19  whose name you don't remember who would run the morning

11:14  20  meetings, that's the person you considered your

21  supervisor?

22  A.        No.  No.  So there was a -- there's like a general

23  manager.

24  Q.        Okay.

11:14  25  A.        The guy -- but he's like the lead supervisor.

48

Antonio Jimenez                                          02/21/2018

1  Q.      Okay.

2  A.      I don't remember his name.  I want to say John but

3  I'm not sure.  And there was another guy that was under

4  him that was also considered a supervisor, and he was the

11:1  5  one that ran the meetings in the morning.

6  Q.      Okay.  Got you.  The main -- the guy we'll call

7  the GM, would you see him during the day?

8  A.      Only when I was in the bigger building I would see

9  him because their office was connected to the warehouse,

11:1? 10  and he would walk through every once in a while.

11  Q.      Got you.  Did you have any interactions with him?

12  A.      Hi and bye.

13  Q.      Okay.  But nothing work related?

14  A.      No.

11:1? 15  Q.      Okay.  So you didn't really consider him your

16  supervisor then because you -- he wasn't directing your

17  work?

18  A.      Yes, exactly.

19  Q.      Okay.  So the person you considered your

11:1? 20  supervisor then was the person who was one step below him?

21  A.      Yes.

22  Q.      Okay.  Got you.  And that's the person who was

23  running the morning meetings.

24  A.      Yes.

11:15 25  Q.      But you can't recall his name?

49

Antonio Jimenez                                    02/21/2018

```
 1  A.      No.

 2  Q.      But he was bald and ...

 3  A.      Yes.

 4  Q.      Correct.  Okay.  Got you.  Did you consider the

11:16 5  leads to be your supervisor or just someone who would --

 6  well, did you consider the leads to be supervisors?

 7  A.      They didn't come off as like a supervisor.  They'd

 8  talk to you like -- just like they were just a regular

 9  employee.  They just knew more because of their time

11:16 10 there.

 11 Q.      Do you know if -- if "lead" was like an official

 12 title they had?

 13 A.      I believe -- yeah, I believe that it was an

 14 official title.

11:16 15 Q.      Okay.

 16 A.      Yeah.

 17 Q.      So what was your job title?

 18 A.      Machine operator.

 19 Q.      Okay.

11:17 20 A.      Forklift operator.

 21 Q.      And then their job title would be something like

 22 team lead?

 23 A.      Yes.

 24 Q.      Okay.  Got you.  And they would speak to you like

11:17 25 a regular employee but they were also directing your work.
```

50

Exhibit B-16

Antonio Jimenez                                              02/21/2018

```
    1 were using the clock.
    2 A.      Yeah, they've probably had the clocks for years
    3 before I got there.
    4 Q.      Okay.  Got you.
11:18  5 A.      I just wasn't in the system yet.
    6 Q.      Understood.  Got you.  Okay.  And then when you
    7 used the paper timesheet, you would just write your start
    8 time and your end time and when you went to lunch?
    9 A.      Um-hum.
11:18 10 Q.      Correct?
   11 A.      Yes.
   12 Q.      Okay.  And then was it the same thing when you
   13 clocked in and out; you would just clock in when you came
   14 in, clock out for lunch, clock back in for work, and then
11:19 15 clock out at the end of the day?
   16 A.      Yes.
   17 Q.      Okay.  Got you.  Did you have a card or something
   18 you used to actually clock in?
   19 A.      Yeah, you had an employee card with just a bar
11:19 20 code on it.
   21 Q.      Okay.  Did it have your -- like your name on it?
   22 A.      I don't believe it -- it might have had my name on
   23 it.
   24 Q.      Okay.
11:19 25 A.      But I -- I know there's just a bar code and the --
```
                                                                52

Antonio Jimenez                                    02/21/2018

```
      1  Q.      Okay.

      2  A.      And they were behind.

      3  Q.      So who would tell you they needed you to work

      4  longer than eight hours?

11:23 5  A.      The leads.

      6  Q.      The leads?

      7  A.      Yeah.  They would -- they would let us know over

      8  the intercom we're going to be staying until this time.

      9  Q.      And when would that announcement usually be made?

11:24 10 A.      About an hour, two hours after lunch.

      11 Q.      And basically that announcement came just about

      12 every day you worked; is that correct?

      13 A.      Yes.

      14 Q.      Okay.  Because I think you said before you pretty

11:24 15 much always worked at least ten hours.

      16 A.      Yes.  Ten hours was a regular day but our schedule

      17 was five eights so considered five eights but never worked

      18 less than ten.

      19 Q.      Okay.  So a team lead then would make the

11:2  20 announcement, you know, everybody's going to work until X

      21 time today?

      22 A.      Well, they would -- the way they would word it

      23 would be there's going to be two hours overtime today or

      24 today's going to be three hours overtime.

11:24 25 Q.      Got you.  And that was over the intercom?
```

56

Exhibit B-18

Antonio Jimenez                                              02/21/2018

```
     1  A.       It was only $10.50 or 11.

     2  Q.       So if you were going to be disciplined and you

     3  were going to be let go for coming in late or whatever,

     4  would it have been the supervisor who did that or the team

11:30 5  lead or somebody else?

     6  A.       It would have been my employer, AtWork Personnel.

     7  Q.       So if you came in late on a Monday, you think

     8  someone from AtWork would have called you to tell you to

     9  leave or ...

11:30 10 A.       Hey, your -- your assignment was terminated.  Why?

    11  Because you were late and, you know, they need people that

    12  are consistent and are going to show up to work.

    13  Q.       Who would have terminated the assignment under

    14  your understanding?

11:30 15 A.       The employer, the -- my employer probably would

    16  have gotten notified by somebody in the office -- I don't

    17  know what title they would have carried -- that they no

    18  longer needed me.

    19  Q.       Someone from Medline like the GM or somebody?

11:30 20 A.       Yeah.

    21  Q.       So were you ever disciplined when you were working

    22  for Medline for anything?

    23  A.       No.

    24  Q.       Ever counseled when you were working for Medline

11:31 25 for anything?
```

61

Exhibit B-19

Antonio Jimenez                                                    02/21/2018

 1 late's not a good thing, especially when you have such a

 2 small group of staff but a large amount of work, you know,

 3 and you need everybody you can.

 4 Q.      Other -- so you -- you said you got a phone call

11:32 5 basically every week from the receptionist from AtWork

 6 telling you what your schedule would be?

 7 A.      No, not -- not -- it wasn't like a regular phone

 8 call.  I mean and it probably wasn't only once a week.

 9 She would call me for just anything basic like, hey, this

11:33 10 is going to be your schedule and this will be your

11 schedule indefinitely until I let you know.

12 Q.      Okay.

13 A.      So it wasn't like, hey, today you can come in at

14 this time but next week you're gonna be coming in at this

11:33 15 time.  It's pretty much like this is going to be your new

16 shift; this is where you need to report to; and once you

17 get there, they'll tell you what you need to do.

18 Q.      Okay.  So after the call when she told you, okay,

19 you're going to be moving from the big building to the

11:33 20 small building, did she ever call you about your schedule

21 again after that?

22 A.      Just to check in how -- how I was doing, if I

23 liked it.

24 Q.      I see.  So, in other words, once she said you're

11:33 25 going to the smaller building, here's when you show up,

                                                              63

Antonio Jimenez                                    02/21/2018

1 A.      So I mean I knew they had their logo on it, but

2 I'm not sure if they owned it or not.

3 Q.      You don't know if they owned it or if it was a

4 lease --

11:35 5 A.      Yes.

6 Q.      -- but they were operating it.

7 A.      Yes.

8 Q.      Understood.  What equipment did you use to do your

9 work at Medline?

11:35 10 A.      A reach forklift.  Raymond brand.

11 Q.      And then occasionally you would use a cherry

12 picker?

13 A.      Yes.

14 Q.      Was that also a Raymond brand or do you know?

11:35 15 A.      Yeah, it was a Raymond brand.

16         MS. HEINRICH:  A what?

17         THE WITNESS:  Raymond.  It's like a -- it's like

18 a -- like a Honda's a car.

19 Q.      BY MR. ADAMS:  Right.

11:35 20 A.      Yeah.

21 Q.      What other equipment did you -- did you use for

22 your job?  Was that it?

23 A.      Yeah.  Yeah, that's it.

24 Q.      Okay.  So you'd use the cherry picker or the

11:36 25 forklift, the reach lift, and then it was just the pallets

65

Antonio Jimenez                                                    02/21/2018

```
 1  or the boxes or whatever you were moving?
 2  A.      Yes.
 3  Q.      Okay.  And that equipment was provided by Medline?
 4  A.      Yes.
 5  Q.      Okay.  You didn't provide any of your own
 6  equipment --
 7  A.      No.
 8  Q.      -- in other words.  Okay.  Have you ever owned or
 9  operated your own business?
10  A.      No.
11  Q.      So have you ever had a business license --
12  A.      No.
13  Q.      -- personally?  And the work you were performing
14  was part of Medline's business, correct?
15  A.      Yes.
16  Q.      And their business was essentially taking medical
17  equipment and selling it to retailers?
18  A.      Hospitals.
19  Q.      Hospitals.
20  A.      Yes.
21  Q.      Okay.  Was it 100 percent medical equipment as far
22  as you know in those warehouses?
23  A.      Yes, it -- I mean it was pretty much anything you
24  could find in a hospital.  Wheelchairs, blankets,
25  syringes, needles, boxes that you put used needles in,
```

66

Exhibit B-22

Antonio Jimenez                                                    02/21/2018

1  they'd put you on a job using a forklift and you would be

2  monitored.  Like, you know, somebody will watch you, see

3  how you perform or make sure you're safe or seeing your

4  production if you're doing it in a speedy manner, if

11:47  5  you're causing like traffic jams in the aisles, anything

6  like that.  Just making sure that you're doing it safe but

7  being productive.

8  Q.     So, in other words, you were kind of on-the-job

9  training?

11:47 10  A.     Yes.

11  Q.     And it was basically an on-the-job test to see if

12  you knew how to use the forklift.

13  A.     Yes.

14  Q.     Were you paid hourly?

11:47 15  A.     At my ...

16  Q.     Sorry.  At -- yeah, when you were working for

17  Medline you were paid hourly?

18  A.     Well, yes, I was paid hourly, yes.

19  Q.     And that was your $10.50 or $11 an hour?

11:47 20  A.     Yes.

21  Q.     Okay.  Did it change or you just can't recall

22  exactly what it was?

23  A.     It was minimum wage so whatever it was at that

24  time, that's what it was.

11:48 25  Q.     Understood.  But you weren't paid by the job?

74

Antonio Jimenez                                                02/21/2018

```
 1  A.      No.
 2  Q.      Could you have earned any kind of bonus or profit
 3  if you had performed really well?
 4  A.      Not for the job I was doing, no.
11:48  5  Q.      Okay.
 6  A.      I believe that there was an incentive program for
 7  people that did pick or order select, but I -- I didn't
 8  perform that job.
 9  Q.      Was it possible that you could have lost money or
11:48 10  not been paid money if you had performed -- not performed
11  well?
12  A.      No.
13  Q.      Was your employment there at will?
14  A.      What do you mean?
11:48 15  Q.      Could you have been fired at any time or could you
16  have quit at any time?
17  A.      Yes.
18  Q.      Okay.  So, in other words, if you decided --
19  decided one day I'm tired of this, you could just say see
11:49 20  ya later; I'm out of here?
21  A.      Just not show up, yeah.
22  Q.      Okay.  Or conversely if they decided for whatever
23  reason it wasn't working out, they could just say it's not
24  working out; you know, don't come back tomorrow?
11:49 25  A.      Well, they would tell my employer and my employer
```

                                                                75

Antonio Jimenez                                           02/21/2018

1  Q.       The GM that you referred to and the supervisors

2  you referred to and the team leads you referred to, those

3  were all employees of Medline?

4  A.       Yes.

11:53  5  Q.       Do you know how -- well, strike that.

6           The first two or three days when you were in the

7  big building, you were -- I think you said earlier you

8  were basically familiarizing yourself with the building

9  and the process, how everything works, correct?

11:54  10  A.       Yes.

11  Q.       Were you running a forklift at that time?

12  A.       No, I was only allowed to be on my feet.

13  Q.       Okay.  So were you actually doing work?

14  A.       No.  I did one day and that was the last day I was

11:54  15  in there where they actually did have me pulling orders.

16  But in the bigger building there's a couple different

17  areas.  So one area is where they pick with the cherry

18  picker and another one is about 10 or 15 aisles of foot,

19  so you just carry a -- how do I explain -- like a cart,

11:55  20  like a -- not a shopping cart but it's just like a --

21  it's -- it's a cart and it has like compartments and you

22  put boxes in it and that's where you put the equipment.

23  You just drag the cart behind you.

24  Q.       I think you said aisles of foot?

11:55  25  A.       On foot.

79

Antonio Jimenez                                                    02/21/2018

```
         1        MR. ADAMS:  Yeah, that's probably a good idea.
         2 Q.     What time did this accident happen?
         3 A.     I don't recall the exact time.  I want to say
         4 around 8 or 9.  Between 8 and 10 in the morning.  I don't
12:51    5 remember an exact time.
         6 Q.     Do you recall what time you started work that day?
         7 A.     No.
         8 Q.     And how exactly did the accident happen?
         9 A.     I was in the aisle doing receiving on a reach
12:51   10 forklift.  I lifted my forks up to put product away.  And
        11 I brought my forks back down, turned away from the rack,
        12 and came to a stop, turned to my left, scanned the rack,
        13 and he bumped into me.
        14 Q.     "He" being who?
12:52   15 A.     Marcus Rodriguez.
        16 Q.     How did you know it was him?
        17 A.     I saw him.
        18 Q.     Was that -- you saw him before or after he bumped
        19 into it?
12:52   20 A.     I saw him after.  My -- my instinct right away --
        21 I don't know if it was the adrenalin or just the way that
        22 it happened, I didn't realize how significant it was until
        23 after the fact.  My instinct right away was to turn around
        24 and like, "What the hell," you know, like what -- like
12:52   25 "Watch out, dude."  And then I felt wet on my leg, like
```

84

Exhibit B-26

Antonio Jimenez                                    02/21/2018

```
 1  A.      Yes.
 2  Q.      And then the ambulance came and took you to the
 3  hospital; is that right?
 4  A.      Yes.
12:57  5  Q.      Okay.  What happened at the hospital?
 6  A.      I had to get an emergency surgery to stop the
 7  bleeding.  And they put drainage tubes inside of my butt
 8  to -- to reduce the risk of any serious infection.
 9  Q.      Got you.  And how long were you in the hospital?
12:57 10  A.      Three days.  Three days I believe.
11  Q.      The surgery was the first day and then the rest of
12  the time you were recovering?
13  A.      Recovering, yes.
14  Q.      Okay.  And then what happened after the three days
12:57 15  in the hospital?
16  A.      I went home.  The doctors gave my girlfriend like
17  specific things that she needed to focus on making sure it
18  was okay and cleaning and if I needed to use the restroom,
19  or if I needed to take a shower, how to wash it and stuff.
12:58 20  Just giving her instructions on how to care for my wounds
21  and what to expect from me being home with like the
22  medications I was on and everything.
23  Q.      Were you able to take a shower immediately or did
24  you have to keep it dry?
12:58 25  A.      No, I had to keep it dry.  So I wasn't able to
```

88

Exhibit B-27

Antonio Jimenez                                          02/21/2018

```
 1          MS. HEINRICH:  -- AtWork or Medline?

 2          THE WITNESS:  Through myself.

 3  Q.      BY MR. ADAMS:  Did you have benefits available to

 4  you through AtWork or Medline?

13:10  5  A.      No.

 6  Q.      Did you work -- perform any work for money between

 7  when you stopped working because of this accident and when

 8  you started at Super Stores Industries?

 9  A.      Yes, part time at McLane.

13:10 10  Q.      That's the concrete?

11  A.      No, McLane is -- it's a distribution center for

12  Pizza Hut, Taco Bell and Kentucky Fried Chicken.

13  Q.      Yum Industries?

14  A.      Yeah, Yum.  They did deal with the ...

13:11 15  Q.      Yum brands or whatever it's called?

16  A.      Yeah, but the name of the warehouse was McLane.

17  Q.      M-c-C-l-a-n-e?

18  A.      M-c-L-a-n-e.

19  Q.      M-c-L-a-n-e?

13:11 20  A.      Yes.

21  Q.      Owned by Drayton McLane, former owner of the

22  Houston Astros?

23  A.      I'm a Dodgers fan.

24  Q.      Well, I'm an Astros fan.

13:11 25  A.      I don't like baseball.
```

97

Exhibit B-28

Antonio Jimenez                                                    02/21/2018

```
 1                  CERTIFICATE OF REPORTER

 2

 3          I, MELISSA LYNN HILL, a duly licensed Certified

 4  Shorthand Reporter of the State of California, hereby

 5  certify that the witness in the foregoing deposition was

 6  by me duly sworn;

 7          That said testimony was taken down in

 8  stenographic shorthand by me, a disinterested person, at

 9  the time and place therein stated and was thereafter

10  reduced to typewriting and that the testimony as

11  transcribed is a true record of the testimony given by

12  the witness;

13          That before completion of the deposition,

14  review of the transcript [x] was [ ] was not requested.

15  If requested, any changes made by the deponent (and

16  provided to the reporter) during the period allowed are

17  appended hereto.

18          I further certify that I am not of counsel

19  or attorney for either or any of the parties to the said

20  deposition, nor in any way interested in the outcome of

21  this cause.

22          DATED this 8th day of March, 2018.

23

24  ------------------------------------
            MELISSA LYNN HILL, CSR 9613

25
```

143

# EXHIBIT C

1   STEVEN A. GROODE, Bar No. 210500
    sgroode@littler.com
2   LITTLER MENDELSON, P.C.
    2049 Century Park East, 5th Floor
3   Los Angeles, CA  90067.3107
    Telephone:    310.553.0308
4   Fax No.:       310.553.5583

5   JOHN H. ADAMS, JR., Bar No. 253341
    jhadams@littler.com
6   LITTLER MENDELSON, P.C.
    500 Capitol Mall, Suite 2000
7   Sacramento, CA  95814
    Telephone:    916.830.7200
8
    Attorneys for Defendant
9   MEDLINE INDUSTRIES, INC.

10

11          UNITED STATES EASTERN DISTRICT COURT

12              EASTERN DISTRICT OF CALIFORNIA

13  ANTONIO JIMENEZ,                    Case No.  2:17-cv-00536-KJM-DB

14              Plaintiff,              **DECLARATION OF SCOTT SALING IN**
                                        **SUPPORT OF DEFENDANT MEDLINE**
15      v.                              **INDUSTRIES, INC.'S MOTION FOR**
                                        **SUMMARY JUDGMENT OR,**
16                                      **ALTERNATIVELY, PARTIAL SUMMARY**
    MEDLINE INDUSTRIES, INC.,           **JUDGMENT**
17  MARCUS RODRIGUEZ; and DOES 1-25,
    inclusive,
                                        Date:      July 13, 2018
18              Defendants.             Time:      10:00 a.m.
                                        Ctrm.:     3, 15th Floor
19                                      Judge:     Hon. Kimberly J. Mueller

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.    Firmwide:155280453.2 049790.1040
3344 PEACHTREE ROAD N.E.
     SUITE 1500
ATLANTA, GA  30326.4803
   404.233.0330

DECLARATION OF SCOTT SALING ISO DEFENDANT MEDLINE'S MOTION FOR SUMMARY JUDGMENT

Exhbiit C-1

1

## DECLARATION OF SCOTT SALING

2    I, Scott Saling, hereby declare and state:

3    1.    Since early September 2007, I have been a Warehouse Manager for Medline

4    Industries, Inc. ("Medline"). Except where stated on information and belief, I have personal

5    knowledge of the following facts and, if called to testify, I could and would competently testify

6    thereto.

7    2.    Medline is a manufacturer and distributor of medical products that primarily serves

8    hospitals and medical service providers. At the time of the events relevant to this action, I worked

9    out of Medline's warehouse in Lathrop, California. That facility closed in August 2016. I now work

10   out of Medline's warehouse in Tracy, California. My job duties are the same today as they were in

11   October 2015, when the events giving rise to this action took place. I have oversight of all inbound

12   and outbound operations at the warehouse, including the movement of product in and out. My job

13   duties include oversight of Medline's supervisors and the warehouse operators who report to them,

14   including forklift operators.   In October 2015, the supervisors at the Lathrop warehouse were

15   Brandon Sublette and Jet Irada.

16   3.    Plaintiff was placed with Medline by AtWork Personnel and began working in

17   Medline's warehouse in Lathrop, California, in early- to mid-October 2015. Plaintiff's job duties

18   primarily consisted of operating a forklift and cherry picker and "order selecting" products from

19   shelves in the warehouse so that they could be shipped to Medline's customers. Plaintiff worked at

20   Medline for approximately two weeks.

21   4.    The Medline facility in Lathrop consisted of two buildings, one of which had

22   approximately 70 warehouse operators working in it (the larger building) and one of which had

23   approximately 10 warehouse operators working in it (the smaller building). Plaintiff began working

24   in the larger building, then switched to the smaller building after a few days. I solely made the

25   decision to move Plaintiff from the larger to the smaller building based on my assessment of

26   Medline's needs at the time in each building. After making that decision, I directed AtWork

27   Personnel to notify Plaintiff should he should begin reporting to the smaller building. I used the

28   same procedure to communicate the schedule that I set for Plaintiff, including the days he would

TTLER MENDELSON, P.C.
3344 PEACHTREE ROAD N.E.
SUITE 1500
ATLANTA, GA 30326.4803
404.233.0330
Firmwide:155280453.2 049790.1040

DECLARATION OF SCOTT SALING ISO DEFENDANT MEDLINE'S MOTION FOR SUMMARY JUDGMENT

1  work and his start time – I directed AtWork to notify Plaintiff what his schedule would be, and I am

2  informed and believe that AtWork passed the information on to Plaintiff.

3      5.    Every morning in the warehouse, we held a "start-up meeting" at which a supervisor

4  or I would instruct the warehouse operators, whether temporary or direct hires, including Plaintiff,

5  what their assignments and job duties would be for that day. We would also tell the employees what

6  to expect for the day, including the number of pallets and amount of product expected to go out of

7  the warehouse that day. In addition to the supervisors and I, certain experienced warehouse operators

8  were charged with helping direct work during the day. These employees would direct other

9  warehouse operators to help with specific tasks or projects on an as-needed basis. These employees,

10  or a supervisor, would also inform warehouse operators when overtime work was available. These

11  employees, as well as the supervisors and I, were all Medline employees. AtWork had no

12  supervision on site and never directed Plaintiff's day-to-day activities at Medline.

13      6.    While Plaintiff worked in the warehouse, Medline issued him a card with a bar code

14  that he used to clock in and out each day. If Plaintiff had any work-related issues, including being

15  late or absent, a supervisor or I would decide if discipline was necessary, including termination of

16  employment.

17      7.    Plaintiff used a reach forklift and occasionally a cherry picker to perform his work for

18  Medline. Medline provided both the reach forklift and cherry picker that Plaintiff used. Plaintiff was

19  not required to provide any of his own equipment.

20      8.    Plaintiff's work for Medline was a part of Medline's regular business and was

21  identical to the work performed by Medline's direct hires. Plaintiff did not operate his own business

22  as part of his work at Medline.  Plaintiff's employment was at-will as is the customary employment

23  status of the nonexempt Medline employees with whom he worked.

24      I declare under penalty of perjury under the laws of the State of California and the United

25  States of America that the foregoing is true and correct.

26      Executed this ___day of June, 2018, at ___Tracy, CA___.

27

28     SCOTT SALING

DECLARATION OF SCOTT SALING ISO DEFENDANT MEDLINE'S MOTION FOR SUMMARY JUDGMENT

Exhbiit C-3