UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO JIMENEZ, | No. 2:17-cv-00536-KJM-DB |
| Plaintiff, | ORDER |
| v. | |
| MEDLINE INDUSTRIES, INC., MARCUS RODRIGUEZ, and DOES 1-25, inclusive, | |
| Defendants. | |

      Plaintiff Antonio Jimenez, an employee of AtWork Personnel Services (AtWork), was assigned to defendant company Medline Industries, Inc. (Medline) to work in a warehouse operating a forklift and a cherry picker on occasion. A Medline employee, defendant Marcus Rodriguez, bumped his forklift blade into Jimenez during work, causing Jimenez injury. After Jimenez obtained a workers' compensation settlement, Jimenez filed suit, asserting claims of negligence and negligent hiring, training and supervision. Medline removed this case from state court to federal court based on diversity jurisdiction. *See* Notice of Removal ¶¶ 10-16, ECF No. 1.

      Medline moves for summary judgment, contending the California Workers' Compensation Act was Jimenez's exclusive remedy and precludes Jimenez from maintaining a negligence claim in a lawsuit for the same accident. *See* Mot., ECF No. 14-1. Jimenez opposes.

Opp'n, ECF No. 16. Medline replied. Reply at 17. For the reasons explained below, the court GRANTS Medline's motion for summary judgment as supported by the law.

I. BACKGROUND

The facts below are taken from Medline's separate statement of undisputed material facts (UMF, ECF No. 14-2), Jimenez's response and separate statement of disputed and undisputed facts (RUMF and SF, ECF No. 16-1) and Medline's response to Jimenez's separate statement (RSF, ECF No. 17-1). The facts are undisputed unless otherwise noted.

Defendant Medline is a manufacturer and distributor of medical products, primarily serving hospitals and medical service providers. UMF 1. AtWork Personnel Services (AtWork), a staffing agency, hired plaintiff Jimenez in or about September 2015. UMF 2.

Jimenez was placed with Medline and began working in Medline's warehouse in October 2015. UMF 4. Jimenez's only placement through AtWork was at Medline. UMF 5. AtWork and Medline had a services agreement stating "[t]he parties recognize that Medline is neither the employer nor the joint employer of [AtWork's] employees." Pl.'s App. of Exs., Ex. C ¶ 5, ECF No. 16-3 at 44.

Jimenez worked at Medline for about two weeks, UMF 6, primarily operating a forklift, UMF 7. Jimenez initially worked in Medline's larger warehouse, then switched to the smaller warehouse after a few days when informed by an AtWork receptionist of this change. UMF 9-10.

The parties do not dispute that Medline communicated at times with an AtWork representative about Jimenez's reporting location and schedule, but they dispute the details of these communications. Medline asserts its warehouse manager, Scott Saling, "solely made the decision" to move Jimenez to the smaller warehouse "based on his assessment of Medline's needs in each building at the time." UMF 11 (citing Saling Decl. ¶ 4). Jimenez contends AtWork informed him he was wanted in the smaller warehouse because of his experience operating forklifts, which included an OSHA certification to operate "reach" lifts and did not include any training from Medline. RUMF 11 (citing Jimenez Dep. at 48:2-4, 67:6-15, 72:7-25, 73:1-13, ECF No. 16-3 at 24-41).

2

Saling directed AtWork to notify Jimenez that he should begin reporting to the smaller building. UMF 12. Saling also communicated the schedule he set for Jimenez to AtWork. UMF 13. The AtWork receptionist called Jimenez to tell him what time to arrive to work and where to report. UMF 14.

Medline employees supervised Jimenez and exercised control over Jimenez's work duties. Specifically, Jimenez attended a meeting every morning run by a Medline supervisor who would provide all employees, including Jimenez, whether temporary or direct hires, their assignments for the day. UMF 16. The Medline supervisor would also tell the employees what to expect for the day, including the number of pallets and amount of product expected to go out that day. UMF 17. Jimenez considered the Medline employee who ran the morning meetings to be his supervisor. UMF 18. Occasionally, other Medline employees would direct Jimenez to stop working on his assigned duties to help with another task. UMF 19. Jimenez believed these Medline employees to be "Leads," who occasionally directed Jimenez's work and informed Jimenez and other employees when overtime work was available. UMF 20-22. The parties agree these Leads and Jimenez's supervisor were Medline employees. UMF 23.

Jimenez used a reach forklift and occasionally a cherry picker, both provided by Medline, but did not use any other equipment. UMF 28-30. Jimenez had an employee card issued by Medline with a bar code on it that Jimenez used to clock in and out at Medline's warehouse. UMF 25. Jimenez did provide his own steel-toed work boots issued to him by AtWork. RUMF 31; Jimenez Dep. at 54:9-14. Jimenez's work for Medline was part of Medline's business and was identical to the work performed by Medline's direct hires. UMF 32.

AtWork did not have supervisory personnel on Medline's premises at the time of the incident, but Jimenez disputes Medline's assertion that AtWork "had no supervision on site and never directed [Jimenez's] day-to-day activities." RUMF 24; UMF 24. Jimenez contends AtWork informed him of changes to his assignment and his schedule, instructed Jimenez when to take his lunch and required Jimenez to wear "AtWork issued steel-toed boots at all times while he was on assignment in the Medline warehouse." RUMF 24 (citing Jimenez Dep. at 38:17-25, 54:11-12, 78:6-9). Specifically, in his deposition, Jimenez stated the AtWork receptionist would

1 | tell him, "You need to be here at this time.  Make sure you take your lunch at this time for this
2 | long and go home when they tell you." Jimenez Dep. at 38:20-25.

3 |       The parties dispute who had the authority to make a final determination about any
4 | necessary discipline or termination of Jimenez.  Medline contends, "Saling or a supervisor would
5 | decide if discipline was necessary, including termination of employment."  UMF 26.  Jimenez
6 | does not dispute that Saling "may have had input" but asserts he "believed that any final
7 | determination regarding discipline or termination of his assignment would have come from his
8 | employer, AtWork Personnel."  RUMF 26 (citing Jimenez Dep. at 61:2-6).  Jimenez admits that
9 | someone in the Medline office would have notified AtWork that discipline or termination of the
10 | assignment was necessary, but Medline alone would not have made the decision to discipline.
11 | RUMF 27; Jimenez Dep. at 61:2-20.

12 |       Jimenez did not operate his own business, was paid by the hour, not the job, and
13 | could not have earned additional income for good performance or be penalized economically for
14 | poor performance.  UMF 33-35.  Jimenez's employment was at-will.  UMF 36.

15 |       On October 26, 2015, a Medline employee, defendant Marcus Rodriguez, bumped
16 | the fork blade of his forklift into Jimenez while Jimenez was operating his own forklift, piercing
17 | Jimenez's buttocks.  UMF 37-39.  Jimenez traveled to the hospital by ambulance and received
18 | medical treatment.  UMF 40.  After his accident, Jimenez filed a workers' compensation claim for
19 | the injury.  UMF 41.  Jimenez settled his workers' compensation claim, receiving approximately
20 | $8,000.  UMF 42.

21 |       Jimenez then sued defendants for (1) negligent hiring, training and supervision;
22 | and (2) negligence.  ECF No. 1 at 25-27.  Medline filed a notice of removal to this court.  *See*
23 | *generally* ECF No. 1.  Medline has moved for summary judgment, contending Jimenez's
24 | negligence claims "are preempted by California's Workers' Compensation Act."  Mot. at 1.
25 | Jimenez has opposed, *see* Opp'n, and Medline filed its reply.  *See* Reply.  The court addresses the
26 | legal standard and discusses the legal issues below.
27 | /////
28 | /////

4

## II. LEGAL STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The moving party bears the initial burden of showing the district court "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Then the burden shifts to the non-movant to show "there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record" or "or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B); *see also Matsushita*, 475 U.S. at 586 ("[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts"). Also, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48.

In deciding summary judgment, the court draws all inferences and views all evidence in the light most favorable to the non-movant. *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant], there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). The Supreme Court has taken care to note that district courts should act "with caution in granting summary judgment," and have authority to "deny summary judgment in a case where there is reason to believe the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255. A trial may be necessary "if the judge has doubt as to the wisdom of terminating the case before trial," *Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1507 (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)), "even in the absence of a factual dispute," *Rheumatology Diagnostics*

*Lab., Inc v. Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at 572).

III. DISCUSSION

The parties dispute whether Jimenez was a special employee of Medline as a matter of law, which—if true—would preclude Jimenez from pursuing the two claims alleged in his complaint. *See* Mot. at 1-2, 5-10, 13; Opp'n at 3, 5-11 (arguing "triable issues of fact" and evidence supporting "conflicting inferences" precludes finding as a matter of law that Jimenez was a "special" employee of Medline and stating Jimenez "has never claimed to be an independent contractor"); Reply at 1-9. The court concludes there is no genuine dispute of material fact sufficient to preclude summary judgment for the reasons explained below. First, the court explains what the California Workers' Compensation Act means for special employees. Second, the court explains California courts' approach to determining special employee status as a matter of law. Third, the court analyzes Jimenez's status as a special employee of Medline.

A. California's Workers' Compensation Act and Special Employees

"An employee may have more than one employer for purposes of worker's compensation, and in situations of dual employers, the second or 'special' employer may enjoy the same immunity from a common law negligence action on account of industrial injury as does the first or 'general' employer." *Santa Cruz Poultry, Inc. v. Superior Court*, 194 Cal. App. 3d 575, 578 (1987); *see also Riley v. Sw. Marine, Inc.* 203 Cal. App. 3d 1242, 1246-47 & n.3 (1988) (affirming summary judgment grant to defendant on claims including negligent supervision and negligent training because workers' compensation was exclusive remedy). Where a special employment relationship exists, "two consequences ensue: (1) the special employer's liability for worker's compensation coverage to the employee, and (2) the employer's immunity from a common law tort action, the latter consequence flowing from the exclusivity of the compensation remedy embodied in [California] Labor Code section 3601."[1] *Santa Cruz Poultry*, 194 Cal. App. 3d at 578.

---

[1] California Labor Code section 3601(a) states in relevant part:

6

When an employer sends an employee to perform work for another person or entity, and both have certain powers of control over the employee's work, the employee is said to have an original or general employer and a special employer. *Kowalski v. Shell Oil Co.*, 23 Cal. 3d 168, 174 (1979) (citing *Miller v. Long Beach Oil Dev. Co.*, 167 Cal. App. 2d 546, 549 (1959)). Both employers must provide workers' compensation benefits, and both are protected by the exclusivity rule under the California Workers' Compensation Act. *Id.* at 175.

Here, Jimenez asserts negligence and negligent hiring, training and supervision claims against Medline and Medline's employee Marcus Rodriguez for the same incident underlying Jimenez's workers' compensation claim settlement. *See* ECF No. 1 at 25-27; UMF 41-42. Thus, if Jimenez is a special employee of Medline or Medline is the special employer of Jimenez, Jimenez is precluded from pursuing his negligence and negligent hiring, training and supervision claims. *See Riley*, 203 Cal. App. 3d at 1246-47 & n.3.

B. <u>Special Employee as a Matter of Law</u>

Although the trier of fact generally determines the existence of an employment relationship, California courts have determined this issue as a matter of law when the evidence supports a single conclusion. *E.g.*, *Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 349 (1989); *Wedeck v. Unocal Corp.*, 59 Cal. App. 4th 848, 857 (1997). California courts have observed "general precedent" that "implies the special employment relationship as a matter of law from the existence of control." *Santa Cruz Poultry*, 194 Cal. App. 3d at 580.

---

> Where the conditions of compensation set forth in Section 3600 concur, the right to recover such compensation, pursuant to the provisions of this division is, except as specifically provided in this section, the exclusive remedy for injury or death of an employee against any other employee of the employer acting within the scope of his or her employment . . . .

California Labor Code section 3600(a)(1) requires, "at the time of the injury, both the employer and the employee are subject to the compensation provisions of this division." California Labor Code section 3600(a)(2) requires, "at the time of the injury, the employee is performing service growing out of and incidental to his or her employment and is acting within the course of his or her employment."

7

To determine whether special employee relationship status attaches, California courts examine the following factors:

> (1) whether the borrowing employer's control over the employee and the work he is performing extends beyond mere suggestion of details or cooperation;
>
> (2) whether the employee is performing the special employer's work;
>
> (3) whether there was an agreement, understanding, or meeting of the minds between the original and special employer;
>
> (4) whether the employee acquiesced in the new work situation;
>
> (5) whether the original employer terminated [its] relationship with the employee;
>
> (6) whether the special employer furnished the tools and place for performance;
>
> (7) whether the new employment was over a considerable length of time;
>
> (8) whether the borrowing employer had the right to fire the employee and
>
> (9) whether the borrowing employer had the obligation to pay the employee.

*Riley*, 203 Cal. App. 3d at 1250. The primary factor in finding special employment is whether the alleged special employer exercised control over the details of the injured worker's work. *Kowalski*, 23 Cal. 3d at 176.

Additionally, California courts have found these circumstances tend to negate the existence of special employment: The employee is

> (1) not paid by and cannot be discharged by the borrower,
>
> (2) a skilled worker with substantial control over operational details,
>
> (3) not engaged in the borrower's usual business,
>
> (4) employed for only a brief period of time, and
>
> (5) using tools and equipment furnished by the lending employer.

*Marsh v. Tilley Steel Co.*, 26 Cal. 3d 486, 492 (1980).

California courts that have evaluated the status of individuals injured while working as temporary or leased employees have generally found such persons to be special

8

employees. *See, e.g.*, *Angelotti v. Walt Disney Co.,* 192 Cal. App. 4th 1394, 1406 (2011) ("In our view, the typical use of a loan-out company in the hiring of talent in the entertainment industry does not mitigate the right of control or the other factors indicating the existence of an employment relationship."); *Santa Cruz Poultry*, 194 Cal. App. 3d at 579 ("[I]n cases such as this where the general employer is a temporary employment agency . . . and the business to which the employee is assigned has the right of supervision and direction of the employment duties, the typical result is to find the existence of a special employment relationship."). *But see Kowalski*, 23 Cal. 3d at 178 (finding "the uncontradicted evidence show[ed] that the [would-be special employer] did not exercise any control over [employee's] duties" and the employee, part of a crew of carpenters building a scaffolding in a shut-down area of the would-be special employer's refinery, "was at all times under the direct supervision of" his general employer's "carpenter foreman").

The court analyzes Jimenez's status as an employee of Medline based on the *Riley* factors, and the *Marsh* factors where relevant, bearing in mind analogous cases.

C.     *Riley* Factors

1.     Control

Medline contends it "controlled [Jimenez's] work, including the details of his job performance at the time of his injury." Mot. at 7-8, 10. Jimenez asserts "Medline exercised very little control over Jimenez's activities at the warehouse." Opp'n at 3, 6-8. The court finds no genuine dispute of material fact that Medline exercised control of Jimenez's work, including the details of his work.

Here, Jimenez does not dispute control by Medline supervisors and "Leads" in various forms throughout his work day, including: a daily meeting run by a Medline supervisor giving Jimenez his daily assignments and telling him what to expect for the day, occasional interruption of Jimenez's assigned work duties to help with another task, occasional direction of work by these "Leads" and informing Jimenez about overtime opportunities. UMF 16-23. Although Jimenez disputes the extent of Medline's control effected through a supervisor's phone calls to AtWork, the parties do not dispute that Saling directed AtWork to notify Jimenez that he

should begin reporting to the smaller building, or that Saling also communicated the schedule he set for Jimenez to AtWork. UMF 12, 13; RUMF 13. Medline's level of control over Jimenez's daily work, including interruptions in his daily routine and assignment to other tasks, equals or exceeds the level of control in other cases where courts have found a special employment relationship as a matter of law. *See, e.g.*, *Ybarra v. John Bean Techs. Corp.*, 853 F. Supp. 2d 997, 1011 (E.D. Cal. 2012) (rejecting plaintiff's contention that employer "did not supervise him sufficiently to create a special employee relationship" where special employer "only spoke with [plaintiff] for approximately five to seven minutes and then left [plaintiff] to do his work for the day"); *Wedeck*, 59 Cal. App. 4th at 859 ("That [the employee] performed her job without constant intervention by supervisor [did] not negate the undisputed fact that she was subject to [special employer's] control and direction"); *Riley*, 203 Cal. App. 3d at 1250 (finding employer "had the right to control and direct [employee's] activities and the manner in which he performed the work"). As noted by a California court, "[t]he relevant factor [is] not that the employer exercised control but that the employer had the right to direct the details of the work." *Wedeck*, 59 Cal. App. 4th at 859.

Medline's control sharply contrasts with that of the would-be special employer in *Kowalski*, 23 Cal. 3d at 178, the case noted above on which Jimenez relies, where the court found "the uncontradicted evidence show[ed] that the [would-be special employer] did not exercise any control over [employee's] duties." The employee "was at all times under the direct supervision of" his general employer's "carpenter foreman." *Id*; *see also Marsh*, 26 Cal. 3d at 493 (finding defendant would remain liable for job-related negligence where employee was a "skilled operator" with "less than a day to complete tasks of mutual interest" and the employee "retained unlimited discretion to operate the crane as he deemed necessary").

Additionally, Medline's undisputed level of control undermines the possibility that a reasonable juror could find Jimenez was "a skilled worker with substantial control over operational details." *Id.* at 492; s*ee Angelotti*, 192 Cal. App. 4th at 1405 (observing, despite the particular skills required of a stunt man, a stunt man employee had no substantial control over the operational details of his work because his work was directed by the stunt coordinator, who

determined employee's daily work schedule and tasks); *Caso v. Nimrod Prods., Inc.*, 163 Cal. App. 4th 881, 890-91 (2008) (television director and two stunt coordinators held to be skilled workers; were also special employees of production company in part because company retained right to control their work); *Wedeck*, 59 Cal. App. 4th at 859 (finding chemist a special employee, despite being a skilled worker, because her employer retained the right to control her work).

This control factor, the "primary factor" in this inquiry, *Kowalski*, 23 Cal. 3d at 176, can only be decided in favor of Medline.

### 2. Performing the Special Employer's Work

The parties do not dispute that Jimenez's work for Medline was part of Medline's business and was identical to the work performed by Medline's direct hires. UMF 32. Thus, this factor also weighs in favor of Medline's characterization as a special employer. Because Jimenez was "engaged in the borrower's usual business," *Marsh*, 26 Cal. 3d at 492, this factor cannot negate Medline's status as a special employer, *see Kowalski*, 23 Cal. 3d at 172-73 (observing plaintiff "was working on building a scaffold" in a "closed down" section of the would-be special employer's refinery as part of a crew of carpenters from another company).

### 3. Agreement or Understanding Between the Original and Special Employer

Here, Jimenez contends the written services agreement between AtWork and Medline reflects an understanding that Jimenez was not Medline's employee. Opp'n at 3, 8-9; *see* Pl.'s App. of Exs., Ex. C at 4 (unsigned services agreement; authenticity not disputed). Medline argues that "the services agreement between Medline and AtWork . . . is irrelevant because the actual nature of the employment relationship in question, not the agreement, controls . . . ." Reply at 2, 7. Medline is correct; California courts examine the actual employment relationship, not the professed relationship in a written contract. *See, e.g.*, *Kowalski*, 23 Cal. 3d at 176-79 (terms of written contract between two employers not conclusive even where they expressly state employer had right to control and direct employee's work; actual nature of employment situation, not contract, controls; employee "was unaware of the contract between [would-be special employer] and [general employer]," "did not expressly agree to an employment relationship with [would-be special employer] and the facts do not indicate that he impliedly

11

consented to the employment relationship"; finding no special employee relationship because of absence of control over employee); *Marin v. Phillips Petrol. Co.*, 42 Cal. App. 3d 916, 919 (1974) ("The contract cannot affect the true relationship of the parties to it. Nor can it place an employee in a different position from that which he actually held.").

Jimenez also raises no genuinely disputed material fact as to an understanding or agreement between the parties that AtWork functioned as Jimenez's sole employer at the Medline site. AtWork admits it did not have supervisory personnel on Medline's premises at the time of the incident. RUMF 24. Although an AtWork receptionist informed Jimenez of changes to his schedule and building assignment, instructed Jimenez when to take his lunch and required Jimenez to wear steel-toed boots Jimenez purchased himself, RUMF 24, none of these facts creates a genuine dispute of material fact as to Jimenez's special employee relationship with Medline. *E.g.*, *Kowalski*, 23 Cal. 3d at 174 (when employer sends employee to perform work for another person or entity, and both have certain powers of control over employee's work, employee is said to have an original or general employer and a special employer); *Santa Cruz Poultry*, 194 Cal. App. 3d at 578 ("An employee may have more than one employer for purposes of worker's compensation . . . .").

4. <u>Employee Acquiescence</u>

"Consent to the special employment relationship is normally implied, by the weight of authority, from acceptance of the special employer's control." *Id.* at 581-82 (citing 1C Larson, Workmen's Compensation Law, § 48.15, p. 8-428 *et seq.*); *see also Kowalski*, 23 Cal.3d at 179. Here, the undisputed facts show Jimenez's acquiescence to Medline's control and supervision. Jimenez considered the Medline employee who ran the morning meetings to be his supervisor. UMF 18. Jimenez accepted the direction of that supervisor as to daily duties, and also accepted interruptions to his assigned duties to help with other tasks. UMF 17, 19-22; Jimenez Dep. at 44:25-45:12; *see Wedeck*, 59 Cal. App. 4th at 861 (plaintiff "accepted the assignment with [special employer] and acquiesced in all of the conditions of [special employer's work site]"); *Santa Cruz Poultry*, 194 Cal. App. 3d at 583 ("[W]hatever the employee's intentions, if any, regarding the nature of his legal status vis-a-vis [sic] [the special employer], in

fact he worked under the supervision and control and at the pleasure of [the special employer], exactly like an employee of [special employer]"). Jimenez does not show any genuine dispute of material fact related to whether he acquiesced to the control and supervision of Medline employees or not, and Jimenez himself believed those Medline employees to be Leads or his supervisors. Thus, this factor weighs heavily in favor of Medline.

     5.  Original Employer Termination

No facts before the court indicate AtWork terminated Jimenez and the parties do not discuss this factor. The court finds it inapplicable here.

     6.  Tools and Place for Performance

Medline contends this factor weighs in favor of a special employee relationship because "Medline was the supplier of the instrumentalities and tools [Jimenez] used to perform his work . . . and the warehouse in which he worked." Mot. at 12. Jimenez relies on AtWork's requiring Jimenez to purchase his own "proper safety equipment (such as steel-toed boots)." Opp'n at 12. But those boots are the only items supplied by AtWork for Jimenez's performance here. In contrast, Medline provided all other tools for the work as well as the location for the work, including a reach forklift and occasionally a cherry picker, and a Medline card with a bar code used for clocking in and out at Medline's warehouse. UMF 25, 28-30. Medline's providing nearly all equipment used by Jimenez aside from the steel-toed boots he wore, and the location for work is consistent with other court's determinations that a special employee relationship exists. *Compare Wedeck*, 59 Cal. App. 4th at 860 (employee "performed [special employer's work] at [special employer's] job site using, with only minimal exceptions, [special employer's] tools and equipment"), *and Angelotti*, 192 Cal. App. 4th at 1405 (although employee used some of his own equipment, special employer provided work place and all essential equipment), *with Kowalski*, 23 Cal. 3d at 179 (finding no special employee relationship in part because general employer "provided all tools and equipment" with one exception "as well as the hard hats and badges with the [general employer] insignia"). Additionally, unlike the employee in *Kowalski*, Jimenez worked only at the Medline warehouses during the relevant time period. *Compare* UMF 4-5, 9-10 (Jimenez working only at Medline warehouses), *with Kowalski*, 23 Cal. 3d at 178-79

13

("Although [plaintiff] had worked on [employer] premises for approximately two-and-a-half months, the record also shows that [plaintiff] had worked elsewhere [for a six month period].").

### 7. Length of Employment

Medline contends this factor weighs in its favor because the "employment with Medline was open-ended." Mot. at 12. "Although he only worked for Medline for approximately two weeks, his employment there was not of a particular duration." *Id.* Jimenez responds that he "worked at the Medline warehouse for approximately ten days." Opp'n at 9. Although this ten-day period shows Jimenez was "employed for only a brief period of time," *Marsh*, 26 Cal. 3d at 492, the length of employment alone would not permit a reasonable juror to infer on this basis alone that Jimenez was not a special employee of Medline. *See, e.g.*, *Santa Cruz Poultry*, 194 Cal. App. at 577 (finding special employment relationship despite employee's assignment being "for one day only," employee being on general employer's payroll, and employee having "the option of refusing any work assignment"); *cf. Kowalski*, 23 Cal. 3d at 173 (explaining plaintiff and his general employer would work for fixed employment term at would-be special employer's location in fixed periods lasting "from four to six weeks" during a shutdown that occurred "about once every six months").

### 8. Borrowing Employer Right to Discharge

The parties dispute who had the right to discharge Jimenez. *Compare* UMF 26, *with* RUMF; *see* Jimenez Dep. at 61:2-20 (testifying that supervisors would have disciplined Jimenez for tardiness and that somebody in Medline's office would have notified Jimenez's employer, AtWork, "that they [Medline] no longer needed me"). Medline also contends "the working relationship between Medline and [Jimenez] was at-will." Mot. at 12. Although the parties dispute who had the right to discharge Jimenez, this dispute is not sufficient to prelude a grant of summary judgment here. *See Wedeck*, 59 Cal. 4th at 862 ("[T]he factual dispute about [special employer's] ability to terminate [employee] from her employment does not raise a triable issue of material fact, given the strength of the other factors—particularly with respect to [special employer's right to control and direct [employee's] activities . . . ."). The court finds the dispute on this factor insufficient to prevent a finding of a special employee relationship as a matter of

law based on the other factors discussed above; *Marsh*, 26 Cal. 3d at 492 (observing where employee is "(1) not paid and cannot be discharged by owner, (2) a skilled worker with substantial control over operational details, (3) not engaged in the borrower's usual business, (4) employed for only a brief period of time, and (5) using tools and equipment furnished by the lending employer" to be circumstances "tend[ing] to negate the existence of a special employment").

### 9. Borrowing Employer Obligation to Pay

No party disputes that AtWork issued Jimenez his paychecks, and Jimenez specifically states AtWork "was responsible for paying and training Mr. Jimenez . . . ." *See* Opp'n at 10. But AtWork's issuance of paychecks does not mean this factor weighs against finding a special employee relationship. Indeed, to the extent no party disputes the services agreement between AtWork and Medline as reflecting Medline's ultimate financial responsibility for Jimenez's work, this factor weighs in favor of finding a special employee relationship. *Compare Wedeck*, 59 Cal. 4th at 853, 961 (finding secondary factors also supported conclusion that plaintiff was special employee where special employer "paid [general employer] and hourly rate for [employee's] work, and [general employer] paid her"), *and Santa Cruz Poultry*, 194 Cal. App. at 577 (finding special employment relationship despite employee's being on general employer's payroll and having "the option of refusing any work assignment"), *with* Pl.'s App. of Exs., Ex. C ¶ 10 (services agreement between Medline and AtWork, explaining conditions in which "[AtWork] employee shall be paid" and amount "then billed to Medline."). This factor weighs in favor of finding a special employee relationship.

### 10. Overall Assessment of Factors; Labor Code § 3852

Given the totality of the circumstances, the court finds there is no genuine dispute of material fact sufficient to permit a reasonable juror to reach a conclusion other than Jimenez and Medline had a special employee relationship.

In his opposition, Jimenez also asserts he could maintain this "third-party lawsuit" while also maintaining a claim for workers' compensation benefits because California Labor Code section 3852 permits him doing so. Opp'n at 11. But because the court has found a special

employee relationship as a matter of law existed between Medline and Jimenez, section 3852, which permits suits "against any person other than the employer," does not apply. At hearing, Jimenez agreed section 3582 does not apply if Jimenez is a special employee of Medline.

IV. <u>CONCLUSION</u>

For the foregoing reasons, the court GRANTS Medline's motion for summary judgment.

IT IS SO ORDERED.

DATED: August 15, 2018.

_____
UNITED STATES DISTRICT JUDGE